

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| SISSETON-WAHPETON OYATE OF THE LAKE TRAVERSE RESERVATION and ROBERT SHEPHERD, Chairman, | * * * * * | CIV 11-3026-RAL |
| Plaintiffs, | * * | |
| vs. | * * | OPINION AND ORDER CONCERNING PARTIAL DISMISSAL OF PLAINTIFFS' COMPLAINT AND SCHEDULING OF TRIAL |
| UNITED STATES CORPS OF ENGINEERS; STEVEN E. NAYLOR, in his official capacity as Regulatory Program Manager; and ROBERT J. RUCH, in his official capacity as District Commander, | * * * * * * * | |
| Defendants. | * | |

## I. Introduction

Plaintiffs Sisseton-Wahpeton Oyate of the Lake Traverse Reservation (the Tribe) and Robert Shepherd (Shepherd), the Tribe's chairman, filed a Complaint and Amended Complaint seeking declaratory, injunctive, and other relief. Doc. 1; Doc. 16. Plaintiffs named as Defendants the United States Corps of Engineers (the Corps), Steven E. Naylor (Naylor), in his official capacity as Regulatory Program Manager, and Robert J. Ruch, in his official capacity as District Commander. Plaintiffs' Complaint challenges the Corps' granting of certain § 404 exemptions and Nationwide Permits to Merlyn Drake (Drake) and how it has dealt generally with Drake's requests and conduct on land adjacent to Enemy Swim Lake, which is within the exterior boundaries of the Tribe's reservation. The Defendants filed a Motion for Partial Dismissal of Plaintiffs' Amended Complaint, Doc. 26, which this Court addressed through a prior Opinion and Order Granting in Part and Denying in Part Motion for Dismissal. Doc. 32.

In that prior Opinion and Order, this Court wrestled with whether some of the Plaintiffs' claims were barred by the six-year statute of limitations based on what the Tribe learned from a meeting on January 25, 2005, about the Corps' decision making regarding Drake's requests. This Court, among other things, granted Defendants' Motion for Partial Dismissal of Plaintiffs' Amended Complaint "as to any and all Counts and claims challenging [Defendants'] exemptions and Nationwide Permit determinations that were discussed during the January 25, 2005 meeting as having been granted, authorized, or determined." Doc. 32 at 22. This Court's ruling was couched in such language because:

> The evidence of what occurred at the January of 2005 meeting is in dispute, but the Tribe appears to have received information about the Corps' permits and exemptions to Drake sufficient to start the running of the statute of limitations from the January 25, 2005 meeting as to those permits and exemptions discussed at the meeting as being finally determined. This Court cannot determine exactly which permits and exemptions were discussed in such a manner, without hearing evidence and evaluating the memory and credibility of witnesses. The Plaintiffs filed their Complaint on November 7, 2011, Doc. 1, after the running of the six year statute of limitations for those permits and exemptions discussed on January 25, 2005, as having been granted, authorized, or determined.

Doc. 32 at 13. After issuing that Opinion and Order, this Court held two evidentiary hearings and allowed the parties to file additional briefing. This Court now rules on the issue left open in the prior Opinion and Order.

## II.    Legal Standard

Plaintiffs' action against the Defendants is brought pursuant to the Administrative Procedures Act, under which the United States has waived sovereign immunity on behalf of agencies such as the Corps. 5 U.S.C. § 702 (2012). Such suits, however, "shall be barred unless

2

the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a); see Izaak Walton League of Am., Inc. v. Kimbell, 558 F.3d 751, 758–59 (8th Cir. 2009) (applying six-year statute of limitations to an Administrative Procedures Act case).

A claim against a governmental agency first accrues "on the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." Izaak Walton, 558 F.3d at 759 (quoting Chandler v. U.S. Air Force, 255 F.3d 919, 921 (8th Cir. 2001)). "A cause of action accrues when there are facts enabling one party to maintain an action against another." Victor Foods, Inc. v. Crossroads Econ. Dev. of St. Charles Cnty., Inc., 977 F.2d 1224, 1226 (8th Cir. 1992) (per curiam). With regard specifically to § 2401(a), "a claim accrues 'when the plaintiff either knew, or in the exercise of reasonable diligence should have known, that [he or she] had a claim.'" Andersen v. U.S. Dep't of Hous. & Urban Dev., 678 F.3d 626, 629 (8th Cir. 2012) (quoting Izaac Walton, 558 F.3d at 759); see also Loudner v. United States, 108 F.3d 896, 900 (8th Cir. 1997). Because a statute of limitations in an Administrative Procedure Act case is a jurisdictional limitation, "the plaintiff will have the burden of proof that jurisdiction does in fact exist." Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990) (citation omitted); Runs After v. United States, No. CIV 10-3019-RAL, 2012 WL 2951556, at *6 (D.S.D. July 19, 2012).

### III. Material Facts Regarding Tribe's Knowledge

It is an issue of fact to determine whether the Plaintiffs "knew, or in the exercise of reasonable diligence should have known, that [they] had a claim" at the time of and as a result from the January 25, 2005 meeting. See Izaac Walton, 558 F.3d at 759. The Corps had issued two exemptions and two Nationwide Permit findings to Drake prior to the January 25, 2005

3

meeting. The Corps had not furnished the Tribe or any of its representatives with any of the two exemption letters or two Nationwide Permit letters. Thus, what occurred at the January 25, 2005, meeting is pivotal to determining if the Tribe knew or should have known that it had a claim regarding the Corps' actions at that time.

### A. Background and Corps' Decisions

Some background is required to understand the Corps' actions and the setting of the January 2005 meeting. In or around 1993, Drake, who is not a tribal member, bought a home on Enemy Swim Lake in an area to the south of Enemy Swim Creek. Doc. 45 at 84–85. The mouth of Enemy Swim Creek is sometimes called an inlet of Enemy Swim Lake. In or around 1996, Drake purchased agricultural land near his lake home that included land on either side of Enemy Swim Creek and its inlet to Enemy Swim Lake. Doc. 45 at 85.

The Tribe considers Enemy Swim Lake to be of tremendous cultural and religious significance. Doc. 16 at ¶ 2. There are burial grounds at or near the lake, plants from the lake are used in ceremonies for medicinal purposes, some tribal members catch fish for sustenance from the lake, and some tribal members consider Enemy Swim Lake to be a sacred place. Doc. 16 at ¶ 2. The Tribe owns some of the land at Enemy Swim Lake.

In 1998, Drake proposed to the Corps to build a seventy-foot span bridge with approach berms across the mouth of Enemy Swim Creek near its inlet to Enemy Swim Lake for access by livestock and equipment. Defendant's Ex. A. The Corps on August 18, 1998, issued a letter to Drake deeming such an agricultural road across the Enemy Swim inlet to be "exempt from requiring a Department of the Army Permit per regulations found at 33 C.F.R. Part 323.4." Defendant's Ex. A. The Corps placed conditions on the project, cautioned Drake about the need

4

to receive approvals from other agencies, and indicated that further authorization may be required should there be changes made in the project. Defendant's Ex. A. Neither Drake nor the Corps notified the Tribe of the Corps' decision at the time of the issuance of this exemption. Drake never built the 70-foot span bridge across the inlet or mouth of Enemy Swim Creek. Doc. 45 at 180–81, 187. Drake appears to have abandoned any intention to build a road across the mouth of Enemy Swim Creek in favor of a different road discussed later in this Opinion and Order. Doc. 57 at 31–32.

In 2000, Drake requested authorization for site grading and construction of an access road associated with a three-tenths of an acre wetland fill for residential lot development. Defendant's Ex. B. That wetland fill and road was to the south of the inlet to Enemy Swim Lake, apart and away from Enemy Swim Creek. Doc. 45 at 181–82. Drake also sought authorization for construction of a culverted agricultural road at a second location, which is to the south of a later road central to this case. Defendant's Ex. B; Doc. 45 at 181–82, 187–88. The Corps, on June 6, 2000, sent Drake a letter advising that the Corps "has determined that your work within South Dakota for site grading and access road is authorized by the Department of the Army Nationwide Permit No. (26)," and that the "culverted road crossing is exempt from further Department of Army authorization." Defendant's Ex. B. Again, the letter cautioned Drake about other possible permit requirements and the need to obtain additional authorizations if there was a deviation from the original plans. Defendant's Ex. B.

By 2000, Drake was in a dispute with at least one of his neighbors, Doug Block, over road access and Drake's activities in the areas covered by the 2000 Nationwide Permit and exemption determination. Doc. 45 at 85–88. The Tribe was not involved in that dispute between

5

and among the non-tribal members who owned lake homes and cabins and property to the south of Enemy Swim Creek.

In 2003, Drake applied to the Corps to construct a culverted farm road approximately four feet high with a twenty-foot wide top across a wetland adjacent to Enemy Swim Creek ostensibly to provide access for livestock and equipment. Defendant's Ex. C; Doc. 45 at 182–83. This is the project that was the focus of much of the evidentiary hearings, as this is the road that cuts through the wetlands just to the south of Enemy Swim Creek. Doc. 45 at 182–83, 187–88. On December 2, 2003, the Corps responded by deeming this "culverted farm road . . . to provide access for livestock and equipment" to be exempt under 33 C.F.R. Part 323.4. Defendant's Ex. C; Doc. 45 at 182–83. Farm roads generally are exempt from the § 404 permitting, and the Corps relied upon Drake's representation that this would be a farm road. Doc. 45 at 207–09. By 2003, however, there were indications that Drake may have been using a pretense of an agricultural road to construct a road contemplating future commercial or residential development of his property. Doc. 45 at 87–88, 171–72. There was no development of this road in 2003, Defendant's Ex. E, but substantial development of the road by 2005. Defendant's Ex. F.

Also, in 2003, Drake sought authorization from the Corps for a different culverted road across a wetland approximately 375 feet long with an 18 foot wide top. Defendant's Ex. D; Doc. 45 at 183–84. This road likewise is to the south of Enemy Swim Creek in the area of the homes and cabins on Enemy Swim Lake, rather than in the immediate proximity of Enemy Swim Creek and its inlet. Doc. 45 at 187–88. The Corps, on December 4, 2003, found the Nationwide Permit to permit such a road within and subject to certain conditions. Defendant's Ex. D.

**B.     The Tribe's Initial Involvement**

The Tribe owns land just to the north of Drake's property, farther north of Enemy Swim Creek than Drake's land. Doc. 45 at 21; Plaintiffs' Ex. P-X; Plaintiffs' Ex. P-AA. The Tribe has a Tribal Realty Office that is responsible to oversee management of the approximately 28,000 acres of tribal land and the approximately 60,000 acres of land owned by tribal members. Doc. 45 at 18–19. The current Tribal Realty director is Alvah Quinn, Sr. Doc. 45 at 18–19.

Prior to becoming director of the Tribal Realty Office, Quinn was the Tribe's Fish and Wildlife director, chief wildlife ranger, and oversaw the land operations department. Doc. 45 at 18. As the Fish and Wildlife director, Quinn's responsibilities were to manage the Fish and Wildlife resources and to enforce tribal game laws. Doc. 45 at 19. The Tribe has a separate Office of Environmental Protection that usually deals with clean water issues, but Quinn has not worked for that office. Doc. 45 at 20.

Sometime before November 8, 2004, Quinn received a call from either Drake or Block about "a bridge going in on the mouth of the stream," meaning a bridge across the mouth of Enemy Swim Creek as the 1998 exemption would have allowed. Doc. 45 at 21; see Defendant's Ex. A. Quinn did not know that the Corps had issued exemptions and Nationwide Permits to Drake at that time. Doc. 45 at 25. Quinn's primary concern was about fish migration and ice chunks lodging beneath any bridge or in any culvert to be installed by Drake. Doc. 45 at 26. Quinn also was concerned about Drake developing the property. Doc. 45 at 27.

Quinn phoned James Oehlerking, who was a civil engineer employed by the Corps and involved in § 404 permitting. Doc. 45 at 21, 25; Doc. 57 at 33. Oehlerking took notes of his conversation with Quinn. Doc. 27-7 at 2, 5. Oehlerking recalled that Quinn identified himself as the land manager for the Tribe and expressed concerns about Drake's activities and the effect

7

on traditional fishing. Doc. 57 at 33–34. Oehlerking understood his discussion with Quinn to be about the wetlands crossing road, that is, the road permitted by the 2003 exemption. Doc. 57 at 33–34; see Defendant's Ex. C. Quinn, by contrast, recalled that he and Oehlerking discussed only the possibility of the bridge crossing the mouth of Enemy Swim Creek and that he did not understand any other activity to have been permitted at that time. Doc. 45 at 28. From the lake itself and from the Tribe's land, the terrain restricted the view of Drake's road through the wetland immediately south of Enemy Swim Creek being constructed. Doc. 45 at 29–31, 161–65, 171. Thus, the phone conversation of November 8, 2004 between Quinn and Oehlerking indicates some awareness by a tribal officer of the Corps having permitted bridge or road work to be done by Drake, but is not sufficient information by which the Tribe's cause of action to challenge such exemption decisions by the Corps accrued.

### C.     January 25, 2005 Meeting

United States Senator Tim Johnson's office received complaints about Drake's development efforts and the Corps' permits and exemptions issued to Drake. On January 25, 2005, at the behest of Senator Johnson's office, the Corps convened a meeting at the Day County courthouse in Webster, South Dakota. A sign-up sheet records the names of thirty-five people in attendance. Defendant's Ex. G. Alvah Quinn attended and signed the sheet "SWO-Realty" leaving a tribal office phone number. Floyd DeCoteau accompanied Quinn at Quinn's invitation and likewise listed "SWO-Realty" with the tribal realty office phone number. Defendant's Ex. G; Doc. 45 at 70–71.

At its two evidentiary hearings, this Court heard testimony from eight of those in attendance at the meeting. Those eight witnesses agreed in part and disagreed in part regarding

8

what was discussed. All agreed that the Corps, primarily through David LaGrone, facilitated the meeting and centered the meeting on what Drake had been allowed to do. Doc. 45 at 220. No one received any handouts at the meeting. Doc. 45 at 33, 71; Doc. 57 at 41, 54. The meeting lasted at least two hours, Doc. 45 at 82–83, and became heated. Indeed a newspaper article described the meeting as "[a] three-hour, knock-down, drag-out mediation session, hosted by the Army Corps of Engineers and Senator Tim Johnson's office [which] did little to resolve an Enemy Swim Lake shoreline spat." Defendant's Ex. H.

The seemingly most neutral and reliable witness who testified was Leslie Murphy,[1] who attended on behalf of the South Dakota Game, Fish & Parks Department. Doc. 57 at 7–8. Murphy took notes at the meeting, transposed those notes into an email sent the next day to certain State of South Dakota department heads, and retained her notes and email message. Doc. 57 at 9; Defendant's Ex. I; Defendant's Ex. J. Neither Murphy nor the State of South Dakota is an interested party in this lawsuit. Murphy recorded in her notes that Alvah Quinn for the Tribe was "concerned over new road" and that the "[n]ew road will disturb spring spawning run." Murphy then recorded that Quinn "saw location map, concerns disappeared—road not going where they thought." Defendant's Ex. I; Doc. 57 at 13–14. Murphy remembered that the Corps and those at the meeting discussed both a big road through the wetlands area and smaller projects to the south of the inlet. Doc. 57 at 16.

---

[1] Sometime between the January 25, 2005 meeting and the November 7, 2013 evidentiary hearing, Murphy changed her name from "Leslie Peterson" to "Leslie Murphy." Doc. 57 at 7. Thus, documents from and about the meeting refer to Murphy as "Leslie Peterson." This Court will refer to Murphy by the name she used at the time of her testimony.

9

Murphy's testimony parallels the testimony of other witnesses. LaGrone recalled discussing each of the four letters to Drake providing exemptions and Nationwide Permits, having the goal to explain each of them and why the actions were taken, and sketching out on butcher block paper what areas were involved in those exemptions and Nationwide Permits. Doc. 45 at 220–22. LaGrone remembered Block and others expressing concerns about roads crossing the wetlands. Doc. 45 at 222. LaGrone said that the Corps would determine if it needed to suspend or revoke the exemptions and Nationwide Permits and suggested that the upset homeowners such as Block establish a homeowners association. Doc. 45 at 222–23. Oehlerking, who was the Corps' primary point of contact with Drake for the exemptions and Nationwide Permits, attended but did not speak at the meeting. Oehlerking recalled that the discussion included talk of the exemption granted in 2003 for the so-called agricultural road just to the south of Enemy Swim Creek. Doc. 45 at 36–37. Oehlerking remembered wide ranging discussion at the meeting on various issues as well. Doc. 45 at 42.

Danny Smeins, a private attorney who was the Day County state's attorney, attended the meeting as well. Doc. 45 at 234. Smeins remembered that the initial focus of the meeting was on discussing the road just south of the inlet of Enemy Swim Creek, but remembered the meeting devolving into other issues and discussion of other of Drake's road projects. Doc. 45 at 235–38. Smeins, who has represented neither Drake nor Block, recalled the Corps officials trying to explain why permits and exemptions had been granted. Doc. 45 at 239, 241.

Those with an interest in stopping Drake's activities have a somewhat different version of the meeting. Quinn's focus was on the possible bridge across the mouth of the stream. Doc. 45 at 33. Quinn recalled Block and Drake arguing, primarily about a slough to the south of

10

Enemy Swim Creek. Doc. 45 at 34–35. Quinn did not recall who was in charge of the meeting, but recalled no decisions being made. Quinn remembered only speaking at the meeting to introduce himself. Doc. 45 at 35. However, when presented with the news article reported on the meeting, Quinn recalled talking with the reporter and confirmed the accuracy of what the reporter quoted Quinn as having said. Doc. 45 at 55–57. The news article, with regard to Quinn's comments, stated:

> Alvah Quinn, Sisseton-Wahpeton Tribal Wildlife Director said the Tribe is concerned about Drake's latest road for environmental reasons. He said the road could negatively impact spawning fish and that the road culvert capacity is a concern, given the upstream drainage area. "We do have concerns about the fish in the stream," he said after the session. "Somebody, whether it's a state, federal, or county agency needs to step up and enforce the laws they have. I don't understand how the Corps people, who don't even live here, or never have seen this stream in the spring, could come up with this decision." Quinn will take his concerns back to the tribal council which is expected to develop a position shortly.

Defendant's Ex. H. Quinn did not recall whether he took his concerns back to the tribal council. Doc. 45 at 58.

Similar to Quinn's testimony, DeCoteau remembered discussion at the January 2005 meeting about a crossing at the mouth of the stream and did not recall any discussion of some crossing farther up the creek. Doc. 45 at 72–75. DeCoteau remembered a very heated exchange between Drake and Block. Doc. 45 at 78–79. DeCoteau described a two-hour long meeting, which left him feeling as if he knew very little. Doc. 45 at 82–83.

Block, contrary to the testimony of other witnesses, denied arguing with Drake at the meeting, but openly admitted that he argued with LaGrone. Block remembered that LaGrone

11

presided over the meeting and that there was some confusion about permits and exemptions. Doc. 45 at 94. Block had prepared a presentation with maps and photographs and was frustrated that LaGrone would not allow him to proceed with his presentation, which led to his conflict with LaGrone. Doc. 45 at 95–98. Block originally testified that he raised the issue of the road through the wetlands to the south of Enemy Swim Creek at the meeting. Doc. 45 at 118–19. At the second evidentiary hearing, however, Block testified that he was prepared to raise a concern about the road crossing through the wetlands to the south of Enemy Swim Creek, but was not allowed to do so. Doc. 57 at 65. When confronted with his prior testimony, Block then acknowledged that he did raise the issue of the road to the south of Enemy Swim Creek. Doc. 57 at 67. Block certainly believed that he was not given a fair opportunity to air his grievances about Drake's activities at the meeting. Doc. 45 at 95–98; Doc. 57 at 65–67.

Witness Scott Grebner remembered relatively little about the meeting. Grebner recalled that Block was there to do a presentation and was not allowed to do so and then got frustrated. Doc. 57 at 55. Grebner had no recollection of discussion of roads through the wetlands and was unaware that Drake was building a road there. Doc. 57 at 55–56. He recalled that the Corps expressed that they were there to listen to concerns. Doc. 57 at 55.

In short, the Corps hosted and sought to maintain control of the January 25, 2005 meeting. The Corps, through LaGrone, sought to describe the exemptions and Nationwide Permits that had been issued. Doc. 45 at 220–22. These covered four different projects—a bridge over the mouth of Enemy Swim Creek that had never been constructed, a road through the wetland just to the south of Enemy Swim Creek, and two projects involving fill and roads to the south of the inlet in the residential area. The meeting was quite large with over thirty-five

12

people in attendance and lasted quite a long time, apparently between two and three hours. Defendant's Ex. G; Defendant's Ex. H; Doc. 45 at 82–83. The focus of the meeting varied between the road to the south of Enemy Swim Creek and the issues surrounding Drake's activities farther south in the area of the lake residences. To those like DeCoteau and Grebner who had little familiarity with Drake's projects before the meeting, it likely was confusing which exemption or Nationwide Permit was being discussed at any particular time.

The varying concerns and goals of those attending caused discussion to range from development along or at Enemy Swim Creek to much discussion about development to the south. The Corps' goal was to explain what it had done, listen to those who were there, and hope that doing so might resolve or assuage concerns and conflicts. Block's goal was to present maps and photos and take control of the meeting at least for some period of time to explain why the Corps ought to stop Drake from any development or projects. Quinn's goal and the Tribe's interests, meanwhile, were to prevent disruption of the inlet and Enemy Swim Creek to allow for migration of fish and to prevent harmful changes to Enemy Swim Lake. It appears that no one's goal—other than those in attendance just to listen such as Murphy and Smeins—was met.

The ultimate issue at the evidentiary hearing, however, was not whether certain goals were met. Rather, the question is whether the Tribe either knew, or in the exercise of reasonable diligence should have known, that it had a claim about the Corps' issuance of exemptions and Nationwide Permits based on information from the January 25, 2005 meeting. As concerns the two exemptions decisions and two Nationwide Permits predating the January 25, 2005 meeting, the Tribe did receive information where it either knew or in the exercise of reasonable diligence should have known about those four agency decisions. Doc. 45 at 58, 220–22; Defendant's Ex.

13

H; Defendant's Ex. I; Defendant's Ex. J. Each of those matters were raised at the meeting. Quinn, the principal representative of the Tribe in attendance, acknowledged the accuracy of his post-meeting quote about the need for a regulatory agency to "step up and enforce the laws they have" and "I don't understand how the Corps people . . . could come up with this decision." Defendant's Ex. H; Doc. 45 at 55–57. Quinn at the meeting came to understand that no bridge was going to be built over the mouth of the Enemy Swim Creek and thus some of his concerns dissipated. Doc. 57 at 13–14; Defendant's Ex. I. There was discussion of the road through wetlands area to the south of Enemy Swim Creek, albeit not to the extent and of the nature that Block wanted. Quinn may not have fully perceived what Drake's next step from that road may be, but the fact that the Corps had exempted such a road for agricultural purposes was discussed. Defendant's Ex. H; Defendant's Ex. I; Defendant's Ex. J; Doc. 45 at 118–19, 220–23, 234–36; Doc. 57 at 13, 37. The meeting included discussion of all of the Nationwide Permit and exemption decisions that had been made through January 25, 2005 for the benefit of Drake at or near Enemy Swim Creek. Doc. 45 at 220–22.

### D.  Authority of Quinn and DeCoteau

Plaintiffs alternatively suggest that Quinn and DeCoteau were not truly representing the Tribe at the meeting or that their presence at the meeting does not thereby provide the Tribe with notice of its claims. The Plaintiffs imply that perhaps someone from the Tribe's Environmental Protection Agency, which deals with clean water issues, needed to be in attendance for the Tribe to have sufficient notice. See Doc. 45 at 20, 70. Although this Court agrees that attendance by a mere member of the Tribe is insufficient to provide the Tribe notice of a potential claim, Quinn and DeCoteau were not mere members of the Tribe.

14

"For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal *if knowledge of the fact* is material to the agent's duties to the principal . . . ." Restatement (Third) of Agency § 5.03 (2006) (emphasis added); see also St. Paul Fire & Marine Ins. Co. v. FDIC, 968 F.2d 695, 700 (1992). Though not as often invoked for purposes of applying a statute of limitations as for other legal relations such as liabilities, the rule is generally applicable. Veal v. Geraci, 23 F.3d 722, 725 (2nd Cir. 1994) (imputing knowledge of lawyer-agent to client-principal to determine when a claim accrued for purposes of the statute of limitations); see also United States v. Josleyn, 206 F.3d 144, 157–59 (1st Cir. 2000) (imputing knowledge of newly discovered evidence known to a director of a corporation to the corporation for the purpose of a motion for a new trial); Martin Marietta Corp. v. Gould, Inc., 70 F.3d 768 (4th Cir. 1995) (applying agency law principles of imputation of knowledge to the issue of whether the statute of limitations barred a claim brought by a corporation). Furthermore, this principle applies outside the context of corporate or business law, and may be applied to government entities that act through agents. See Tonelli v. United States, 60 F.3d 492, 495 (8th Cir. 1995) (applying the imputed knowledge doctrine to the U.S. Postal Service). Thus, the issue is whether the facts discussed about Drake's plans and the § 404 exemptions and Nationwide Permits relevant thereto were material to the scope of either Quinn's or DeCoteau's responsibilities.

Quinn and DeCoteau both signed in as "SWO-Realty," indicating that they were attending the meeting as representatives of the Tribe's realty office, which they in fact were. Defendant's Ex. G; Doc. 45 at 18, 70. In January 2005, Quinn was responsible for managing the Tribe's "fish and wildlife resources." Doc. 45 at 20. Quinn testified at the November 5th hearing that the

15

possibility of erosion "fill[ing] in the stream" could negatively affect fish spawning. Doc. 45 at 26. Although he does not recall it now nine years later, Quinn, according to notes taken at the time, spoke at the meeting about the Tribe's concern about whether the "new road will disturb spring spawning run." Defendant's Ex. I; Defendant's Ex. J. A news reporter's printed article attributed that comment to Quinn as a "tribal wildlife director," and spoke with Quinn afterwards who expressed the Tribe's concern for Drake's latest road based on the impact on spawning fish and culvert capacity. Defendant's Ex. H. Quinn also told the reporter that he would take concerns back to the tribal council. Defendant's Ex. H. Quinn acknowledged the accuracy of the reporter's recordation of these quotes. Doc. 45 at 56–57. While Quinn denies having had any responsibilities relating to the Clean Water Act, Doc. 45 at 20, that is of no consequence with regard to imputation of the knowledge he acquired at the meeting on January 25, 2005, so long as the facts he learned were material to his responsibilities to the Tribe. At the meeting, Quinn learned that the Corps of Engineers had made decisions about § 404 exemptions and Nationwide Permits that would allow Drake to discharge fill material into Enemy Swim Lake. Those facts were material to his responsibility of managing Tribal wildlife resources because such fill material can affect spawning. Therefore, the facts Quinn learned at the January 25, 2005 meeting regarding the § 404 exemptions and Nationwide Permits are imputable to the Tribe.

Moreover, Quinn was no temporary or low-level employee of the Tribe; he has worked for the Tribe for the past thirty-four years. Doc. 45 at 18–19. It is troubling that the Corps did not advise the Tribe directly,[2] but the Corps understood the Tribe to lack regulatory control over

---

[2] The Corps later met with the Tribe on July 31, 2009 at a tribal council meeting. Plaintiff's Ex. 59; Doc. 45 at 36–38.

16

land owned by a non-tribal member. Doc. 57 at 51. Nevertheless, Quinn, attending the meeting on behalf of the Tribe and not merely as a concerned citizen, received information on January 25, 2005, sufficient to be aware of the Nationwide Permits and exemption decisions regarding Drake's activities.

## IV.     Conclusion and Order

This is not to say that all of the Plaintiffs' claims against the Corps are time barred. Some, but fewer than all, of the Plaintiffs' claims were filed within the statute of limitations period. Wherefore, based on the reasoning above and on the Opinion and Order Granting in Part and Denying in Part Motion for Partial Dismissal, Doc. 32, it is hereby

ORDERED that Defendant's Motion for Partial Dismissal of Plaintiffs' Amended Complaint, Doc. 26, is granted with respect to the exemptions and Nationwide Permit determinations made on August 18, 1998; June 6, 2000; December 2, 2003; and December 4, 2003. It is further

ORDERED that Defendant's Motion for Partial Dismissal of Plaintiffs' Amended Complaint, Doc. 26, is denied to the extent that it sought dismissal of the Corps' exemptions and Nationwide Permit determinations as non-justiciable, but granted to the extent that the Corps' decision not to modify, suspend, or revoke those determinations are non-justiciable. It is further

ORDERED that those remaining claims, for permit determinations and other matters that occurred within six years of the Complaint being filed are not otherwise dismissed. It is finally

ORDERED that counsel for the parties meet to discuss a proposed scheduling order for placement of the case on the Court's trial docket and submit within twenty-one days a joint

motion proposing a scheduling order, or, if the parties cannot agree, separate submissions proposing dates and providing a brief explanation of why such dates are being proposed.

Dated September 18th, 2014.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE