**FILED**

SEP 2 9 2016

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| SISSETON-WAHPETON OYATE OF THE LAKE TRAVERSE RESERVATION, ROBERT SHEPHERD, CHAIRMAN,<br><br>        Plaintiffs,<br><br>vs.<br><br>UNITED STATES CORPS OF ENGINEERS, ROBERT J. RUCH, IN HIS OFFICIAL CAPACITY AS DISTRICT COMMANDER; AND STEVEN E. NAYLOR, IN HIS OFFICIAL CAPACITY AS REGULATORY PROGRAM MANAGER,<br><br>        Defendants. | 3:11-CV-03026-RAL<br><br><br>OPINION AND ORDER REGARDING REMAINING ISSUES |

Plaintiffs Sisseton-Wahpeton Oyate of the Lake Traverse Reservation (the Tribe) and Robert Shepherd, the Tribe's then-Chairman, filed a Complaint and Amended Complaint seeking declaratory, injunctive, and other relief. Doc. 1; Doc. 16. Plaintiffs named as Defendants the United States Corps of Engineers (Corps), Steven E. Naylor, in his official capacity as Regulatory Program Manager, and Robert J. Ruch, in his official capacity as District Commander. Plaintiffs' Complaint challenges the Corps granting of certain exemptions and permits under the Clean Water Act (CWA) to Merlyn Drake (Drake), and how it has dealt generally with Drake's requests and conduct on land adjacent to Enemy Swim Lake, which is within the exterior boundaries of the Tribe's reservation.

1

## I.     Facts

This lawsuit centers on the Tribe's concern about development at Enemy Swim Lake within the Lake Traverse Reservation in South Dakota. Doc. 16 at ¶ 1. The Tribe considers Enemy Swim Lake (Toka Nuwan Yapi) to be of tremendous cultural and religious significance. Doc. 16 at ¶ 2. There are burial grounds at and near the lake, plants from the lake are used in ceremonies and for medicinal purposes, some tribal members spear and catch fish for sustenance from the lake, and many tribal members consider Enemy Swim Lake to be a sacred place. Doc. 16 at ¶ 2. The land surrounding the lake is owned by the Tribe, tribal members, and non-tribal members. Doc. 16 at ¶ 2.

Drake, who is not a member of the Tribe, owns land adjoining Enemy Swim Lake. Doc. 16 at ¶ 7. Drake acquired the land from Leo K. Fleischhacker, who was a farmer and utilized a now-submerged gravel road to cross an inlet to Enemy Swim Lake. Doc. 16 at ¶¶ 25–26. Drake has himself been constructing for the last several years the farm roads and bridge, which are approximately one mile in length and travel through an inlet to and crossing near the shoreline of Enemy Swim Lake. Doc. 16 at ¶¶ 14–15. Certain of Drake's prior receipt of exemptions and permits for activities on this property challenged in this litigation were time barred or otherwise dismissed. See Sisseton-Wahpeton Oyate of the Lake Traverse Reservation v. U.S. Corps of Eng'rs, 124 F. Supp. 3d 958 (D.S.D. 2015); Sisseton-Wahpeton Oyate of the Lake Traverse Reservation v. U.S. Corps of Eng'rs, No. CIV–11–3026–RAL, 2014 WL 4678052 (D.S.D. Sept. 18, 2014); Sisseton-Wahpeton Oyate of the Lake Traverse Reservation v. U.S. Corps of Eng'rs, 918 F. Supp. 2d 962 (D.S.D. 2013). The remaining issues in this case involve certain exemptions and permits under the CWA received in 2006 and 2009 by Drake from the Corps

relating to excavation and extraction activities to create farm roads and a bridge to improve access to a portion of Drake's land. Doc. 16 at ¶ 11; Doc. 69 at 17; Doc. 90.

On January 25, 2005, because of the Tribe's and other neighbors' misgivings about Drake's intended property use, the office of United States Senator Tim Johnson coordinated a meeting concerning Drake's development projects at the Day County Courthouse in Webster, South Dakota. Doc. 18-46 at ¶ 5; Doc. 27-6 at 4. This meeting was attended by, among others, Drake, Alvah Quinn, a member of the Tribe and its Fish and Wildlife Director, Doc. 18-46 at ¶¶ 1–3, Floyd DeCoteau, a member of the Tribe and a lease clerk for Tribal Realty, Doc. 18-47 at ¶¶ 2–3, David LaGrone, a civil engineer for the Corps, Doc. 27-6, and Drew C. Johnson, a private attorney representing various individual landowners, Doc. 27-6 at 25–27. The focus of the meeting was on Drake's activities at Enemy Swim Lake and the Corps' action to that point in allowing or not intervening in those activities.

In September 2005, Drake completed an "Application for Department of the Army Permit" to construct a bridge across the primary inlet tributary of Enemy Swim Lake for access to agricultural land northwest of the inlet. RA 1456; Doc. 32 at 4–5. On May 1, 2006, the Corps informed Drake that the bridge[1] would be exempt from the individual permitting requirements of the CWA because it qualified as a farm road. Doc. 16 at ¶ 33; Doc 18-9 at 2. This 2006 bridge project was incomplete at the time of the filing of the present lawsuit and although Drake had recently placed decking on the bridge, it had yet to be used at that time. Doc. 16 at ¶¶ 34–36. The bridge is made of steel I-beams and is wide enough for a two-lane road. Doc. 16 at ¶¶ 37–38.

---

[1] Throughout the opinion, this project will be referred to as the "2006 bridge exemption" or "2006 bridge project."

In October 2008, Drake again applied for a permit with the Corps, seeking permission to construct two culverted road crossings across two gullies[2] west of the 2006 bridge project.  RA 2987.  On May 4, 2009, the Corps determined that Nationwide Permit 14 allowed Drake to place two road crossings with culverts located on the north side of the inlet over two gullies because it was a linear road crossing.  Doc. 18-9.

In 2009, the Tribe made a Freedom of Information Act request regarding the Corps' dealings with Drake and received responsive documents.  In 2009 and 2010, the Tribe and the Corps exchanged several letters.  On June 15, 2009, the Tribe asked the Corps to withdraw the exemption decisions and permits granted to Drake.  Doc. 18-2 at 1.  On July 7, 2009, the Corps provided an interim response to the Tribe.  Doc. 18-5.  The Tribe sent an additional letter on May 2, 2010.  Doc. 18-8.  The Corps then responded with a letter on August 30, 2010, which opened by thanking the Tribe "for this further opportunity to explain the decisions we have made and the actions we have taken over the course of our twelve-year involvement in this matter."  Doc. 18-9 at 1.

In February of 2012, the Tribe filed an Amended Complaint against the Corps seeking declaratory and injunctive relief on several claims under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06.  Doc. 16.  This Court granted in part the Corps' motion to dismiss in an Opinion and Order that dismissed "any and all Counts and claims challenging Corps' exemptions and Nationwide Permit determinations that were discussed during the January 25, 2005 meeting" because they were time barred.  Doc. 32 at 22; Sisseton-Wahpeton Oyate, 918 F. Supp. 2d at 974–75.  Following two evidentiary hearings, this Court concluded that determinations made by the Corps as to various projects of Drake's on August 18, 1998; June 6,

---

[2] Throughout the opinion, this project will be referred to as the "2009 gully crossings."

4

2000; December 2, 2003; and December 4, 2003 were final and known to tribal officials as a part of the January 25, 2005 meeting, and thus the Tribe's challenges to those determinations were time barred. Doc. 69 at 17; Sisseton-Wahpeton Oyate, 2014 WL 4678052, at *9. The Tribe's claims challenging the "Corps' decisions not to modify, suspend, or revoke those determinations" were dismissed as non-justiciable. Doc. 32 at 22; Sisseton-Wahpeton Oyate, 918 F. Supp. 2d at 975. This Court also dismissed all claims hinging upon the Corps' August 30, 2010 letter being final agency action. Doc. 32 at 22; Sisseton-Wahpeton Oyate, 918 F. Supp. 2d at 975. Remaining at issue is whether the Corps violated the requirements and implementing regulations of the National Historic Preservation Act (NHPA) and the CWA when it issued an exemption under the CWA for Drake's 2006 bridge project, and when it determined that Drake's 2009 gully crossings qualified under a Nationwide Permit (NWP).

## II.    Standard of Review

Plaintiffs challenge the Corps' action under the NHPA[3] and the CWA through the APA. Under the APA, the United States waived its sovereign immunity on behalf of federal agencies, such as the Corps. 5 U.S.C. § 702. Agency action reviewed under the APA cannot be set aside by a reviewing court unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is both narrow and highly deferential. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). A reviewing court cannot "substitute its judgment for that of the agency," id., and "[i]f

---

[3] The Eighth Circuit has implicitly recognized that the NHPA includes a private right of action, but Plaintiffs have not chosen to challenge the Corps' actions through the NHPA directly. See Ringsred v. City of Duluth, 828 F.2d 1305, 1309 (8th Cir. 1987); Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs, 194 F. Supp. 2d 977, 989–90 (D.S.D. 2002). But see Sisseton-Wahpeton Oyate v. U.S. Dep't of State, 659 F. Supp. 2d 1071, 1079–80 (D.S.D. 2009) (disagreeing with Yankton Sioux Tribe, 194 F. Supp. 2d at 990 and not citing Ringsred, 828 F.2d at 1309 in holding that there was no private right of action in the NHPA).

5

an agency's determination is supportable on any rational basis, [the Court] must uphold it,"
Voyageurs Nat'l Park Ass'n v. Norton, 381 F.3d 759, 763 (8th Cir. 2004). A court may only
find that an agency's decision was arbitrary and capricious if "the agency has relied on factors
which Congress has not intended it to consider, entirely failed to consider an important aspect of
the problem, offered an explanation for its decision that runs counter to the evidence before the
agency, or is so implausible that it could not be ascribed to a difference in view or the product of
agency expertise." McClung v. Paul, 788 F.3d 822, 828 (8th Cir. 2015) (quoting Motor Vehicle
Mfrs. Ass'n, 463 U.S. at 43).

This case involves claims made by Plaintiffs that deal with both the Corps' statutory
interpretation and the Corps' interpretation of its own regulations. Where the Corps has
interpreted CWA or NHPA, judicial scrutiny of the interpretation is guided by the two-step test
found in Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984). First, the
court looks to "whether Congress has directly spoken to the precise question at issue." Id. at
842. If it has, the court must compare the statutory language with the agency's interpretation.
Id. at 842–43. If it has not, the court must determine whether "the agency's answer is based on a
permissible construction of the statute," even if the agency's construction was not "the only one
it permissibly could have adopted." Id. at 843 & n.11. Where the Corps has interpreted its own
regulations, the Corps' interpretation cannot be disturbed, unless it is "plainly erroneous or
inconsistent with the regulation." Auer v. Robbins, 519 U.S. 452, 461 (1997) (quoting
Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989)). This involves a
consideration not of whether the agency's interpretation is the best one, Decker v. Nw. Envtl.
Def. Ctr., 133 S. Ct. 1326, 1337 (2013), but whether the interpretation is a "fair and considered
judgment on the matter in question," Auer, 519 U.S. at 462.

6

## III.    Law Concerning Statutory Claims

### A.  The Clean Water Act

The CWA was passed in an effort to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  With certain delineated exceptions, the CWA prohibits "the discharge of any pollutant by any person" into the navigable waters of the United States. Id. § 1311(a).  The Corps is authorized to issue individual permits that allow "the discharge of dredged or fill material into the navigable waters at specified disposal sites." Id. § 1344(a).  In addition to individual permits, the Corps is authorized to develop and issue general permits lasting five years that cover activities that "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." Id. § 1344(e). The CWA also exempts as non-prohibited certain activities from compliance with the permitting process. Id. § 1344(f).

The NWP program developed from the allowance for general permits within the CWA. See id. § 1344(e).  NWPs are designed to "regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. § 330.1(b).  The process for creating a NWP involves a public notice and hearing procedure, and includes an analysis of the effects of the NWP under the CWA's and the National Environmental Protection Act's (NEPA) requirements. See 33 U.S.C. § 1344(e)(1)–(2) (authorizing the Corps' issuance of general permits subject to prior review conditions); 33 C.F.R. § 330.5 (b)(3) (noting requirements under NEPA and CWA for NWPs); 42 U.S.C. § 4332(C) (detailing NEPA requirements); 40 C.F.R. Pt. 230 (detailing requirements for all permits under CWA to follow).  Only after this multi-layered approval process are the NWPs published in the Federal Register and valid for a period of five years.  33 U.S.C. § 1344(e)(2); see generally 33 C.F.R. Pt. 330 (governing the issuance and administration

7

of the NWP program).   Individuals whose actions comply with the requirements of a specific NWP can proceed under the NWP without an individual permit, and in most cases without notifying the Corps, to dispose dredged or fill material into regulated waters, provided they comply with any conditions attached to the NWP.   33 C.F.R. § 330.2(c).   These General Conditions are published alongside the NWPs and "are additional provisions which place restrictions or limitations on all of the NWPs." Id. § 330.2(h).

"No activity which may affect properties listed or properties eligible for listing in the National Register of Historic Places[] is authorized" until the Corps complies with Appendix C, the Corps' guidance for complying with NHPA.   33 C.F.R. § 330.4(g); Reissuance of Nationwide Permits, 72 Fed. Reg. 11,092, 11,192–93 (Mar. 12, 2007) (outlining General Condition 18, which is based on 33 C.F.R. § 330.4(g)).   The Corps requires that "[n]on-federal permittees will notify the [District Engineer] if the activity may affect historic properties which the National Park Service has listed, determined eligible for listing, or which the prospective permittee has reason to believe may be eligible for listing, on the National Register of·Historic Places." Id. at § 330.4(g)(2).   The proposed activity may not then begin "until . . . the requirements of the National Historic Preservation Act have been satisfied." Id. at § 330.4(g)(2).

The NWP at issue here is NWP 14 as it was in effect in 2007. Reissuance of Nationwide Permits, 72 Fed. Reg. at 11,183–84. This NWP allows "[a]ctivities required for the construction, expansion, modification, or improvement of linear transportation projects (e.g., roads . . .) in waters of the United States." Id. at 11,183. The NWP requires "pre-construction notification" to the Corps "if:  (1) The loss of waters of the United States exceeds 1/10 acre; or (2) there is a discharge in a special aquatic site, including wetlands." Id. at 11,184. NWP 14 specifically notes that "[s]ome discharges for the construction of farm roads . . . may qualify for an

exemption under Section 404(f) of the Clean Water Act." Id. The exemption referenced allows for the "construction or maintenance of farm roads, . . . where such roads are constructed and maintained, in accordance with best management practices." 33 U.S.C. § 1344(f)(1)(E). As an exception to the exemption, if the exempted road would bring "an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced," that road would be subject to regulation, or "recaptured," under the CWA. Id. § 1344(f)(2).

## B. The National Historic Preservation Act

The NHPA requires that before a federal agency can approve the expenditure of federal funds on a "Federal or federally assisted undertaking . . . or prior to the issuance of any license," the agency head shall "take into account the effect of the undertaking" on historic properties. 54 U.S.C. § 306108.[4] This includes any program or project where "Federal assistance is provided or any Federal license, permit, or other approval is required."[5] Id. at § 306105. In addition, the agency head "shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to" any National Historic Landmark. Id. at § 306107. The

---

[4] After the commencement of this lawsuit, the NHPA was reorganized and recodified in Title 54 of the United States Code, from Title 16. Act of Dec. 19, 2014, Pub. L. No. 113-287, 128 Stat. 3094 (recodifying acts relating to the National Park Service into a new title of the United States Code). This opinion uses citations to the current statutes in Title 54, while mindful to apply the NHPA as it existed at the time of the Corps' decision making.

[5] The definitions section of the NHPA defines "undertaking" in full as

> [A] project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including—
> (1) those carried out by or on behalf of the Federal agency;
> (2) those carried out with Federal financial assistance;
> (3) those requiring a Federal permit, license, or approval; and
> (4) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

54 U.S.C. § 300320.

9

agency must allow the Advisory Council on Historic Preservation (Advisory Council), created under the NHPA, to comment on the undertaking's effect on a historic property. Id. at § 306108.

In its guidelines, the Corps defines an undertaking as "the work, structure or discharge that requires a Department of the Army permit pursuant to the Corps regulations." 33 C.F.R. Pt. 325, App'x C at (1)(f). In the regulations implementing the NHPA, the Advisory Council defines an undertaking as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval," which is verbatim from the NHPA's definitions section. 36 C.F.R. § 800.16(y); Protection of Historic Properties, 65 Fed. Reg. 77,698, 77,712 (Dec. 12, 2000); see also 54 U.S.C. § 300320. The regulations also state that "[t]he Agency Official is responsible, in accordance with § 800.3(a), for making the determination as to whether a proposed Federal action is an undertaking," but should seek advice from the Advisory Council "when uncertain about whether or not its action falls within the definition of an undertaking." Protection of Historic Properties, 65 Fed. Reg. at 77,712. The Corps and the Advisory Council disagree about whether the Corps' regulations comply with the NHPA in several areas. See Doc. 90-2.

After determining that a Corps project is a federal undertaking, the process of minimizing harm to historical properties, known as the Section 106 process,[6] begins. The first step is to determine whether the undertaking "is a type of activity that has the potential to cause effects on historic properties." 36 C.F.R. § 800.3(a). "If the undertaking is a type of activity that does not have the potential to cause effects on historic properties, assuming such historic properties were

---

[6] The original public law enacting the NHPA included these procedures within Section 106. Despite changes and amendments to its statutory location, it continues to be known commonly as the "Section 106 process."

present, the agency official has no further obligations under section 106 or this part." Id. § 800.3(a)(1). The Advisory Council has clarified that at this step agencies "should not be considering case-specific issues," but should instead focus on the "'type and nature' of the undertaking." Protection of Historic Properties, 65 Fed. Reg. at 77,703. No further codified guidance is given regarding which types of activities have the potential to cause effects on historic properties, or the proper assumption[7] of the presence of historical properties during this analysis.

If the Section 106 process continues because there is the potential for the type of activity to have an effect on a historic property, the area of potential effect (APE) of the undertaking must be identified; and then through consultation with the State Historic Preservation Officer (SHPO) and if applicable the Tribal Historic Preservation Officer (THPO), the agency must determine whether the undertaking itself will have an effect within the APE on any historic properties present; finally, the SHPO, THPO, and Advisory Council have the opportunity to review and object to the Corps' finding. 36 C.F.R. § 800.4(a)–(d). This consultation process, once initiated, must involve the THPO, "even if the location of the historic property is off tribal lands." White Earth Nation v. Kerry, No. 14-4726 (MJD/LIB), 2015 WL 8483278, at *6 (D. Minn. Dec. 9, 2015).

## IV. Discussion

### A. National Historic Preservation Act Claims

---

[7] On its website in an informal question and answer section provided to the public, the Advisory Council emphasizes that "[t]he presence of historic properties must be assumed at this stage," and that "[i]f a question arises about an agency improperly using this provision, it should be brought to [the Advisory Council's] attention under Section 800.9(a)." Section 106 Regulations Section-by-Section Questions and Answers, Advisory Council on Historic Preservation (Aug. 30, 2013), http://www.achp.gov/106q&a.html.

Plaintiffs make two claims regarding the NHPA.[8]  First, Plaintiffs argue that the Corps' decision deeming the 2006 bridge exemption not to be an "undertaking" and thus not triggering the Section 106 process was arbitrary and capricious. Doc. 90 at 12–18.  Second, Plaintiffs argue that the Corps' process in determining that the 2009 gully crossings under NWP 14 had no potential to cause effects on historic artifacts was arbitrary and capricious. Doc. 90 at 18–26.

### 1.  2006 Bridge Exemption

Plaintiffs first argue that the Corps acted in an arbitrary and capricious manner by deeming Drake's 2006 bridge project to fall under the farm road exemption of the CWA and therefore not to be an undertaking triggering the Section 106 process.  Doc. 90 at 12–13. Plaintiffs claim that the 2006 bridge project was an undertaking because it received the Corps' approval under the standards set out in the CWA for exemptions, Doc. 90 at 13–14, including that the Corps is responsible for ensuring Drake's project complies with the CWA's Best Management Practices (BMP), Doc. 90 at 16–18.  Plaintiffs argue that the varying definitions for an undertaking between the Advisory Council's and the Corps' implementing regulations make the Corps' regulations invalid in determining what constitutes an undertaking. Doc. 90 at 14–16.

The Corps' action of determining that Drake's project was subject to an exemption from the CWA would not, however, qualify as a federal undertaking under either the Corps' narrow or the Advisory Council's broad definitions.  As applicable here, the Advisory Council's definition of an undertaking, mirroring the NHPA statute, includes "those requiring a Federal permit, license or approval."  36 C.F.R. § 800.16(y); see also 54 U.S.C. § 300320(3).  The Corps'

---

[8] The Corps has not alleged that Plaintiffs are barred from these claims because they first must exhaust their administrative remedies.  "The NHPA does not *require* the Tribe to exhaust its administrative remedies prior to seeking judicial review." Yankton Sioux Tribe, 194 F. Supp. 2d at 992 (exercising judicial discretion to dismiss tribe's NHPA claim without prejudice for failing to exhaust administrative remedies) (emphasis in original).

determination that Drake's 2006 bridge project would be subject to the farm road exemption within the CWA did not require a permit; it was an exemption from a permit. It also did not require federal approval; it was an exemption from the necessity of federal approval under the CWA. "The explicit terms of Section 106 . . . require a finding not just of agency 'action,'" such as the Corps' action in finding Drake's activities to be subject to an exemption, "but of an 'undertaking'—that is, 'a project, activity, or program.'" Nat'l Trust for Historic Pres. v. Blanck, 938 F. Supp. 908, 918–19 (D.D.C. 1996) (quoting 16 U.S.C. § 470(w)(7), now codified at 54 U.S.C. 300320(3)).

The United States Court of Appeals for the Eighth Circuit has deemed actions not to be undertakings when they have involved far more federal action than the farm road exemption at issue here. See Ringsred, 828 F.2d at 1308–09 (finding that the Secretary of the Interior's approval of a parking ramp structure being built by an Indian tribe under 25 U.S.C. § 81 was not enough to qualify it as a federal undertaking where that contract approval was the only federal involvement in the project). Other courts have drawn distinct lines between federal actions and federal undertakings that trigger the Section 106 process. See CTIA-Wireless Ass'n v. FCC, 466 F.3d 105, 114–15 & n.4 (D.C. Cir. 2006) (holding that construction of cell phone towers requiring approval via registration from the FCC were a federal undertaking subject to NHPA, but noting that towers below a certain height, not requiring registration with the FCC would not be included within this holding); Sheridan Kalorama Historical Ass'n v. Christopher, 49 F.3d 750, 754 (D.C. Cir. 1995) (noting that "federal authority to fund or to license a project can render the project an undertaking, but the decision of the funding or licensing agency is not itself an undertaking," and that the failure of the Secretary of State to disapprove a proposed demolition was not an undertaking); Grand Canyon Trust v. Williams, 98 F. Supp. 3d 1044, 1065–66 (D.

Ariz. 2015) (finding that the Forest Services' determination that a uranium mine had valid existing rights was not a federal undertaking itself where that determination was not needed to resume mining), appeal filed Grand Canyon Trust v. Williams, No. 15-15857 (9th Cir. Apr. 28, 2015). But see Fein v. Peltier, 949 F. Supp. 374, 379 (D.V.I. 1996) (finding that because a private property owner's original deed required cooperation with the National Park Service in avoiding interference with historic properties on the land, any construction of a residence upon the land constituted an undertaking).

If the act of approving an exemption to the CWA were an undertaking for purposes of the NHPA, the Section 106 process would apply in every project involving the navigable waters of the United States. Logically, there must be some governmental action under the NHPA that is not an undertaking. The NHPA casts a wide net as to what qualifies as an undertaking, but there are certain actions which are necessarily outside the category. Accordingly, many courts treat the decision of what is a "federal undertaking" under the NHPA the same as what is a "major federal action" within the NEPA. See San Carlos Apache Tribe v. United States, 417 F.3d 1091, 1097 (9th Cir. 2005); Sac and Fox Nation of Mo. v. Norton, 240 F.3d 1250, 1263 (10th Cir. 2001). The NEPA does not require the preparation of an Environmental Impact Statement (EIS), the cornerstone of the NEPA's protections for the environment, when a particular project is excluded from the NEPA because it is not a major federal action. See 42 U.S.C. § 4332(C)(i); Save Barton Creek Ass'n v. Fed. Highway Admin., 950 F.2d 1129, 1133 (5th Cir. 1992) (per curiam) ("The requirements of NEPA, which include, among other things, the submission of an EIS, apply only when the federal government's involvement in a project is sufficient to constitute 'major Federal action.'"). Protections for historic places—though critically important—should not be held categorically higher than protections for the environment,

14

especially when Congress has not dictated that exemptions or exceptions to major federal statutes should be deemed federal undertakings within the NHPA's jurisdiction.

As this Court previously decided, the Corps' ongoing responsibilities to oversee Drake's compliance with BMPs is subject to the Corps' enforcement authority.  Sisseton-Wahpeton Oyate, 124 F. Supp. 3d at 963–64.  The ability of the Corps to monitor Drake's compliance with BMPs, without more, is not enough to transform the 2006 bridge exemption into a federal undertaking.  Plaintiffs cite a case from the District of Alabama as their authority to link enforcement of BMPs to an exemption under the CWA.  Doc. 92 at 8; United States v. Smith, No. 12–00498–KD–C, 2014 WL 3687223, at *1 (S.D. Ala. July 24, 2014).  However, the Smith case stands for the proposition that approval from the Corps is not necessary to make the farm use exemption from the CWA apply, and thus a federal undertaking is not present simply by virtue of BMP responsibility.  Id. at *2.  Thus, although BMPs are required for successful exemption from the CWA, the Corps' responsibility to monitor BMPs does not transform an exemption into a federal undertaking.

### 2.  2009 Gully Crossings

Plaintiffs' second claim regarding the NHPA is that the Corps was arbitrary and capricious in deciding that the 2009 gully crossings allowed under NWP 14 had no potential to affect historic places.  Doc. 90 at 18–20.  The Corps appeared not to properly consider whether the 2009 gully crossings were the type of undertaking that had the potential to affect historic properties assuming such properties were present, so this Court remands this issue for the Corps' further consideration.

Plaintiffs argue that the Corps failed to assume that historic properties were present when making the initial decision regarding whether the gully crossings approved under NWP 14 would

15

be the type of undertakings that would have the potential to effect historic places. Doc. 90 at 20–21. The Administrative Record suggests that the Corps did assume the presence of historic properties in the gully crossing area when processing Drake's NWP 14 application. See RA 3291; RA 3413; RA 3414; RA 3523; 3597; RA 3610; RA 3612. However, the Corps appears to have skipped the initial question of whether the 2009 gully crossings were the *type* of activity that had the potential to affect historic places, and moved into a question of whether there were any *exact* places that could be impacted. See 36 C.F.R. § 800.3(a).

The NHPA's implementing regulations require that this initial question not involve site-specific details of the project and historic properties existing within the APE, but look only at the type of work planned generally, assuming there could be historical properties present. Protection of Historic Properties, 65 Fed. Reg. at 77,703 ("The previous language implied that making such a determination related to the circumstances of the particular undertaking, rather than the more generic analysis of whether the type of undertaking had the potential to affect historic properties."). Although using the language of a finding of "no potential to effect" in both the communications with Drake and briefing to this Court, the Corps appears to have done the research and made findings consistent with a "no effect" determination, involving whether any historic properties actually in existence would be affected by the gully crossings; this analysis should occur later in the Section 106 process and requires consultation with the SHPO, THPO, and Advisory Council. See, e.g., RA 3036; RA 3413; RA 3523; RA 3597; RA 3610; RA 3612; Doc. 91 at 16; see also 36 C.F.R. § 800.4(d)(1) (describing the requirements of a finding of no effects); Reissuance of Nationwide Permits, 77 Fed. Reg. at 11,192–93. Neither the Administrative Record nor the parties' submissions indicate that the Corps considered, either on its own or through the assertions of Drake, whether gully crossings were the *type* of activity that

16

could affect historic properties. In its informal website explanation of the "no potential to effect" decision, the Advisory Council gives an example of the types of activities that might qualify for a "no potential to effect" decision:

> The presence of historic properties must be assumed at this stage. For example, grants for libraries to acquire books do not have the potential to affect historic properties; grants for "meals-on-wheels" programs, however, do, because the money may be used for providing kitchen facilities, the construction of which has the potential to affect historic properties.

Section 106 Regulations Section-by-Section Questions and Answers, Advisory Council on Historic Preservation (Aug. 30, 2013), http://www.achp.gov/106q&a.html#800.3. It seems that if a grant for a "meals-on-wheels" program is the type of undertaking that has the potential to affect historic properties, the construction of two gully crossings over an inlet protected by the CWA would be as well, and the Section 106 process should continue. Cf. Pres. Soc. of Charleston v. U.S. Army Corps of Eng'rs, No. 2:12–2942–RMG, 2013 WL 6488282, at *1, *4, *11, *16 (D.S.C. Sept. 18, 2013) (holding that it was an improper scope of analysis under the NEPA to consider only whether individual concrete pilings, rather than a passenger ship terminal, had the potential to affect environmental and historical resources under the NEPA and the NHPA, and rejecting the Corps' determination that the project was not the type that could affect historical properties). By failing to consider whether the type of undertaking was one that could cause potential effects on historic properties, the Corps removed itself from having to complete additional steps in the Section 106 process. If the Corps had determined that the gully crossings were the type of undertaking that could affect historic properties, the Corps would be required to consult with the Tribe regarding historic tribal properties within the project area.

A prejudicial error analysis controls whether to "hold unlawful and set aside" the Corps' action of failing to consider if the type of undertaking at issue had the potential to cause effects on historic properties. 5 U.S.C. § 706(2)(A). "The burden to demonstrate prejudicial error is on

17

the party challenging the agency action." Cty. of Charles Mix v. U.S. Dep't of Interior, 799 F. Supp. 2d 1027, 1043 (D.S.D. 2011) (quoting Jicarilla Apache Nation v. U.S. Dep't of Interior, 613 F.3d 1112, 1121 (D.C. Cir. 2010)). The Tribe has shown the potential for historic properties to be located within the project area. Doc. 92 at 2, 10 (identifying a photograph of a potential burial mound located near the project site, a video of the investigation of additional possible cultural locations in the area, and identifying sources indicating the commonality of Dakota spiritual sites to be located near lake shorelines). Although the Corps investigated and determined there were no properties listed or eligible for listing on the National Historic Register, which may have otherwise constituted non-prejudicial error, this process did not include tribal involvement, a significant oversight in a location ripe with tribal history. See, e.g., RA 3523. Thus, it is possible that the Corps' failure to consider the type of undertaking before beginning the Section 106 process resulted not only in circumventing tribal consultation, but also overlooking legitimate historical site information that could only be provided by the Tribe, and this qualifies as prejudicial error. Therefore, the matter ought to be remanded to the Corps for appropriate further agency action on Drake's 2009 gully crossings application, in accordance with the process identified at 36 C.F.R. § 800.3(a).

Plaintiffs next argue that the Corps failed to consult with the THPO to identify historic resources as required by the NHPA, its implementing regulations, and the Corps' regulations for complying with the Section 106 process. Doc. 90 at 22–24. Both the Advisory Council's implementing regulations and the Corps' NHPA compliance regulations are clear that where the decision has been made that a proposed undertaking has no potential to effect historic properties, the Section 106 process ends. See 36 C.F.R. § 800.3(a)(1); Protection of Historic Properties, 65 Fed. Reg. at 77,718; see also Valley Cmty. Pres. Comm'n v. Mineta, 373 F.3d 1078, 1090 (10th

Cir. 2004); <u>Save Our Heritage, Inc. v. FAA</u>, 269 F.3d 49, 62 (1st Cir. 2001); <u>Nat'l Post Office Collaborative v. Donahoe</u>, No. 3:13cv1406 (JBA), 2013 WL 5818889, at *8–10 (D. Conn. Oct. 28, 2013); <u>McGehee v. U.S. Army Corps of Eng'rs</u>, No. 3:11–CV–160–H, 2011 WL 2009969, at *5 (D.W.D. Ky. May 23, 2011); <u>Chugach Alaska Corp. v. U.S. Forest Serv.</u>, No. A99–414 CV (JWS), 1999 WL 33946351 (D. Alaska Dec. 14, 1999). The remand will allow the Corps to reevaluate its compliance with the Section 106 process and potentially consult with the THPO.

Finally, Plaintiffs argue that it was an improper delegation of agency responsibility that the conditions of NWP 14 allowed Drake to oversee his own compliance with the NHPA. Doc. 90 at 24–26. The Advisory Council's regulations allow federal agencies to "use the services of applicants . . . to prepare information, analyses and recommendations under [Section 106]," but "the agency official is responsible for ensuring that [a document's] content meets applicable standards and guidelines." 36 C.F.R. § 800.2(a)(3). In addition to informing Drake that he was responsible for notifying the Corps should he suspect the presence of any historical properties, the Corps themselves investigated whether there were historic properties within the area of the gully crossings. <u>See</u> RA 3523; RA 3597; RA 3610. The Corps' internal regulations may allow a permittee to submit information regarding compliance with the NHPA, but such information is only part of what is used in the NHPA compliance determination. <u>See</u> RA 3712 ("The district engineer shall make a reasonable and good faith effort to carry out appropriate identification efforts . . . Based on the information submitted [by an applicant] *and these efforts*, the district engineer shall determine whether the proposed activity has the potential to cause an effect on the historic properties.") (emphasis added). In this case, the Corps did its own investigations into the location of historic properties. <u>See</u> RA 3523; RA 3597; RA 3610; <u>see also</u> <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Engr's</u>, No. 16-1534 (JEB), 2016 WL 4734356, at *20 (D.D.C.

Sept. 9, 2016) (noting that permitting under a NWP "would be arbitrary and capricious where it relies completely on the unilateral determination of a permittee that there is no potential cultural resource that will be injured by its permitted activity," but where the Corps considered any potential effects itself there was no need to decide that issue). Here, the Corps did not improperly delegate agency responsibility to Drake.

## B. Clean Water Act Claims

Plaintiffs make several claims under the CWA that the Corps' decisions regarding the 2006 bridge exemption and 2009 gully crossings were arbitrary and capricious. Plaintiffs argue that the Corps failed to give the required public notice to adjacent landowners after receiving Drake's initial application, Doc. 90 at 26–28; the Corps failed to engage in consultation with the Tribe under Executive Order 13,175 and the Corps' regulations, Doc. 90 at 28–29; the Corps should have known that Drake was not using the 2006 bridge exemption or the 2009 gully crossings for their intended purposes, Doc. 90 at 29–30; the Corps authorized the 2009 gully crossings in violation of the prohibition against piecemealing, Doc. 90 at 31–32; the Tribe had jurisdiction to perform the necessary water quality certification under the CWA, Doc. 90 at 32–33; and finally, the Corps failed to accurately identify the amount of wetlands that would be lost and engage in appropriate mitigation measures, Doc. 90 at 33–34.

### 1. 2006 Bridge Exemption

Plaintiffs first argue that prior to authorizing Drake's exemption for the 2006 bridge project under the CWA, the Corps should have provided public notice because Drake filed an "application" for a permit. Doc. 90 at 26; see also RA 1456. Plaintiffs elevate style over substance, and concentrate on the fact that Drake filed a document entitled "application" with the Corps, but do not address the difference of procedures between the process for a permit

application and the process for a CWA exemption, and are unable to cite to any authority indicating that public notice is required when the Corps determines an exemption to the permitting process of the CWA applies. Doc. 90 at 26–27. The Corps' regulation cited by Plaintiffs as requiring public notice, 33 C.F.R. § 325.2(a)(2), features a preface in the previous section that "[t]he processing procedures of this part apply to any Department of the Army (DA) permit." 33 C.F.R. § 325.1(a). Although Drake initiated contact with the Corps through a document that included the word "application," the Corps did not issue or deny a permit for the 2006 bridge that would fall under the public notice procedures of 33 C.F.R. § 325.2(a)(2). As the Corps points out, accepting Plaintiffs' position would mean the Corps would be required to issue not just public notice, but complete the full spectrum of procedures contained in Part 325 any time there was an exemption to the CWA under 33 U.S.C. § 1334(f), which would render the exemptions nearly meaningless. Doc. 91 at 20–21. Further, in describing the application form and its appropriate contents, the Corps' regulations state that "[c]ertain activities have been authorized by general permits and do not require submission of an application form but may require a separate notification." 33 C.F.R. § 325.1(c). If projects authorized under a NWP or other general permit do not require an application and further compliance with the procedures in Part 325, it does not make sense to this Court that an exemption from the CWA would require compliance.[9]

Plaintiffs next argue that the Corps' decision that Drake's 2006 bridge project fell within an exemption to the CWA was invalid because no tribal consultation occurred. Doc. 90 at 28–

---

[9] In their Reply Brief, Plaintiffs cite to dicta in a Fourth Circuit case for the proposition that the Corps was required to issue public notice in this case. Crutchfield v. Cty. of Hanover, 325 F.3d 211, 220–21 (4th Cir. 2003). Crutchfield can be factually distinguished, especially as to the 2006 bridge exemption, because it involved a project initiated under the individual permit program of the CWA, and later switched to qualification under a NWP.

29. Plaintiffs recognize that tribal consultation with the THPO under the NHPA's Section 106 does not apply to the 2006 bridge project. Instead, Plaintiffs rely on the terms of Executive Order 13,175, the purpose of which is "to establish regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications." Exec. Order No. 13,175, 65 Fed. Reg. 67,249, 67,249 (Nov. 6, 2000). This is accomplished through a series of directives requiring agencies to ensure the receipt of input from tribes "when formulating and implementing policies that have tribal implications." Id. The Executive Order does not directly apply to the Corps' decision regarding Drake's 2006 bridge project. The plain language of the Executive Order refers to the development of agency "policies," which it defines as "regulations, legislative comments or proposed legislation, and other policy statements or actions." Id. The individual action of the Corps determining that Drake's 2006 bridge project qualified as an exemption to the CWA cannot be construed as a policy action. Moreover, the Executive Order does not create a private right of action and specifically states that it was "not intended to create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law by a party against the United States, its agencies, or any person." Id. at 67,252; see also Indep. Meat Packers Ass'n v. Butz, 526 F.2d 228, 234–35 (8th Cir. 1975) (noting that executive orders only have "the force and effect of laws when issued pursuant to a statutory mandate or delegation of authority from Congress," and that if an order has the force of law, aggrieved parties "would still have to demonstrate that it was intended to create a private right of action").

Plaintiffs also invoke the Corps' own tribal consultation requirements as applicable to both the 2006 bridge exemption and the 2009 gully crossings. Only one consultation policy cited by Plaintiffs was in effect at the time of the 2006 decision, the Department of Defense's

American Indian and Alaska Native Policy. The Policy, signed in 1998, specifically states that it does not "provide an independent cause of action upon which the Department may be sued," and it is not intended to expand any existing legal rights. William S. Cohen, American Indian and Alaska Native Policy, Dep't of Defense (Oct. 20, 1998), at 1 n.b, n.2; see also Yankton Sioux Tribe v. U.S. Dep't of Health and Human Servs., 533 F.3d 634, 644 (8th Cir. 2008) (affirming a dismissal under Fed. R. Civ. Pro. 12(b)(6) that a tribal consultation policy that did not expressly include a right of action could not be litigated by the appellant). Thus, the Corps did not violate any tribal consultation policy in effect at the time of the decisions in this case.[10]

Finally, Plaintiffs argue that the Corps' decision to determine Drake's 2006 bridge project qualified for the farm road exemption was arbitrary and capricious because the Corps should have known, based on concerns received and the size of the proposed bridge, that Drake was not using the bridge for the reasons stated in his application, which would move the project outside the scope of the farm road exemption. Doc. 90 at 29–30. A district court's mandate in reviewing agency interpretation of law is not to "substitute its judgment for that of the agency," Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, but only to determine whether the "agency's determination is supportable on any rational basis," Voyageurs Nat'l Park Ass'n, 381 F.3d at 763. Using the Chevron analysis, this Court determines that while Congress has allowed for

---

[10] The Corps subsequently has adopted its own consultation policies in accordance with the goal of Executive Order 13,175 being to "strengthen the United States government-to-government relationships with Indian tribes." Exec. Order 13,175, 65 Fed. Reg. at 67,249. The tumultuous history of relations between tribal nations and the federal government in this country has resulted, in large part, due to unilateral actions on the part of the federal government. See Sisseton-Wahpeton Oyate, 124 F. Supp. 3d at 968 (noting the United States as "a country whose development and governmental decisionmaking was often at the expense of tribal sovereignty and self-determination of tribal members"). Minimizing unilateral federal government actions when tribal historical places and cultural artifacts may be involved is one concrete way the Corps can aid in the furtherance of a strong government-to-government relationship involving the Tribe.

exemptions for farm roads under the CWA, it has not spoken to this precise issue. <u>Chevron</u>, 467 U.S. at 842–43. Thus, this Court moves on to the second question under <u>Chevron</u>—determining whether "the agency's answer is based on a permissible construction of the statute," even if it was not "the only one it permissibly could have adopted." <u>Id.</u> at 843 & n.11.

In this situation, the Administrative Record contains support for the Corps' determination that Drake's 2006 bridge project was for the purpose of the building of an exempt farm road, and thus the exemption finding was not an arbitrary and capricious determination. Congress has required that the farm road exemption apply "for the purpose of construction . . . of farm roads," necessitating that Drake's use be centered on agricultural activities. 33 U.S.C. § 1344(f)(1)(E). While Plaintiffs point to many situations in the Administrative Record where the Corps was warned that Drake was not a farmer and may have planned to engage in activities that would take his project out of the farm road exemption, Doc. 90 at 29, the Corps' own investigation and findings were that Drake was going to use the bridge for the purposes of a farm road, Doc. 91 at 26–27. The Corps confirmed Drake's use of the property for agricultural purposes at the time of the application. The Corps went on a site visit and observed cattle grazing in Drake's pasture. RA 1429. The Corps took note of photographs of cattle on Drake's property, submitted by a third party. RA 1338; RA 1513. The third party, an individual who has continually objected to Drake's projects in the area of Enemy Swim Creek, observed cattle crossing "the exact stream locations as they have for years prior." RA 1331; RA 1338. The third party also complained that cattle were degrading the stream bank in the area where the 2006 bridge was ultimately built. RA 1339. Furthermore, after receiving allegations that Drake did not plan to use the bridge for agricultural purpose, the Corps re-examined the project and determined that the farm road exception still applied. RA 1513–17. The additional arguments made by Plaintiffs in

24

regards to the size of the bridge necessary for such farm use are not convincing.  See Doc. 90 at 30.  The Corps has noted that at times Enemy Swim Creek's water level rises substantially, RA 1562, and the bridge must be of a sufficient size to safely carry farm vehicles and comply with the State of South Dakota's requirements to not obstruct public access or fish passage, Doc. 91 at 30; RA 2429–33.  The Court previously ruled in favor of the Corps on issues of BMP compliance and recapture issues relating to the bridge, and will not revisit those rulings at this time.  Sisseton-Wahpeton Oyate, 124 F. Supp. 3d at 963; Doc. 90 at 31 n.15.  This decision of course is not to embolden either Drake to use the 2006 bridge or road to facilitate commercial development, or the Corps to disregard whether Drake complies with BMPs or possible recapture.  The Corps' determination at the time was "based on a permissible construction of the statute" and is supported by the record in this case.  Chevron, 467 U.S. at 843.

### 2.  2009 Gully Crossings

Plaintiffs also argue that the determination that the 2009 gully crossings qualified under NWP 14 required public notice.  Doc. 90 at 26–28.  For the same reasons as noted above, this Court determines that the Corps was not required to issue public notice for a project falling under a general permit program, rather than the Corps' individual permitting process.  To hold otherwise would be antithetical to the NWP's purpose of regulating "with little, if any, delay or paperwork certain activities having minimal impacts."  33 C.F.R. § 330.1(b); see also Standing Rock Sioux Tribe, 2016 WL 4734356, at *4 ("[A] permittee may typically rely on the general permit without even notifying the Corps of its covered activity.").

Plaintiffs next argue that tribal consultation was required for the 2009 gully crossings because General Condition 16 to the NWPs states that "[n]o activity or its operation may impair reserved tribal rights, including, but not limited to, reserved water rights and treaty fishing and

hunting rights." Reissuance of Nationwide Permits, 72 Fed. Reg. at 11,192.  In reissuing the

NWPs, the Corps indicated that district engineers are to determine whether tribal rights would be

impacted by an activity "on a case-by-case basis, through appropriate consultations with Indian

tribes." Id. at 11,158.  Because the Tribe has not alleged any specific violations of reserved

rights[11] in either the Administrative Record or the briefings specifically in relation to the 2009

gully crossings, this Court cannot determine whether the Corps has violated General Condition

16.  The communication pointed to by Plaintiffs regarding spearfishing under reserved rights

occurred in 2004,[12] and the telephone notes indicate it was in relation to a "bridge x-ing," not the

gully crossing location at issue in the 2009 determination.  RA 0053.  The Corps of course ought

to be consulting with the Tribe under the current tribal consultation policy, and the Corps may

have an opportunity to do so under the NHPA in light of the remand on that issue.  But, the

absence of consultation does not itself under General Condition 16 render the NWP 14 finding to

be arbitrary and capricious.

Plaintiffs next argue that in approving the 2009 gully crossings under NWP 14, the Corps

knew that Drake was "piecemealing" a single project in order to avoid the Corps' individual

permitting requirements.  Doc. 90 at 31–32.  Indeed, Drake has sought a number of exemptions

and NWPs through the years for what ostensibly is a farm road with bridges.  This challenge

involves the interpretation of the Corps' own regulations, so the standard of review is not

whether the "agency's interpretation . . . [is] the best one," Decker, 133 S. Ct. at 1337, but only

---

[11] Some of the Corps' arguments improperly put on the Tribe the burden of initial contact
regarding whether there were any reserved rights.  Doc. 91 at 33–34.  General Condition 16 does
not require the Tribe to initiate contact, but states only that "[n]o activity or its operation may
impair reserved tribal rights."  Reissuance of Nationwide Permits, 72 Fed. Reg. at 11,192.
Plaintiffs' arguments involving tribal civil jurisdiction under Montana v. United States, 450 U.S.
544 (1981) were not part of their Complaint and are misplaced in this APA case.
[12] Challenges to the Corps' decisions predating the 2006 bridge exemption are time barred under
this Court's prior rulings.  Sisseton-Wahpeton Oyate, 2014 WL 4678052, at *9.

whether the interpretation is a "fair and considered judgment on the matter in question," Auer, 519 U.S. at 462. The commentary to NWP 14 specifies that "in the case of linear transportation projects, a 'single and complete project' consists of a single crossing of a water of the United States, or more than one crossing at the same location." Reissuance of Nationwide Permits, 72 Fed. Reg. at 11,109. Further definitions note that "[p]hased developments can be authorized by the NWP, provided that each phase is a single and complete project and has independent utility." Id. at 11,125. "Independent utility" is defined as a situation where the project "would be constructed absent the construction of other projects in the project area," but this definition is not in specific reference to NWP 14. Id. at 11,196. The Corps relies on these definitions to support its determination that the 2009 gully crossings were themselves a single and complete project. Doc. 91 at 32. Plaintiffs counter that because Drake might build a new lakeshore home, the road should be considered the single and complete project, not the crossings themselves. Doc. 90 at 31–32. As indicated in the re-issuance of NWPs in 2007, NWP 14 can be applied even when "there may be future development activities," because the effects of any future development activities must necessarily "be addressed through applicable permitting requirements if and when future activities are proposed." Reissuance of Nationwide Permits, 72 Fed. Reg. at 11,110. This of course is not to endorse any development activity by Drake using the farm road. However, the Corps' determination that the 2009 gully crossings were a single and complete project is a "fair and considered judgment on the matter in question," and this Court will not overturn the Corps decision on this issue. Auer, 519 U.S. at 462.

Plaintiffs also assert that the Tribe may have had jurisdiction to conduct the CWA's required water quality certification, and the Corps was aware of that possibility, so its failure to consult with the Tribe on the issue was arbitrary and capricious. Doc. 90 at 32–33. The CWA

requires that before a federal permit may be issued under its requirements, a water quality certification must be obtained from the state where the project is located. 33 U.S.C. § 1341(a)(1). Under the CWA, tribal governments can apply to the Environmental Protection Agency (EPA) to be "treated as states" for the purpose of water quality certifications, and can develop independent water quality standards to apply within the tribe's jurisdiction. 33 U.S.C. § 1377(e); Montana v. U.S. Envtl. Protection Agency, 137 F.3d 1135, 1138–39 (9th Cir. 1998). The Tribe has neither presented evidence that it has EPA authorization to be treated as a state for purposes of the CWA water quality certifications, nor explained how there is tribal jurisdiction over these requirements. See RA 2958; RA 3037 (communications relating to the Tribe's ability to complete water quality certifications coming from the Corps, not from the Tribe). Water quality has a close connection to reserved tribal fishing rights, but the Tribe has provided no indication on this record that separate tribal water quality standards are a reserved treaty right.

Plaintiffs then argue that the Corps failed to engage in the necessary mitigation required for the project because it did not accurately measure the amount of wetlands that would be lost through the construction of the 2009 gully crossings. Doc. 90 at 33–34. General Condition 20(e) in place at the time of the 2009 gully crossings determination required compensatory mitigation whenever "wetland losses [] exceed 1/10 acre." Reissuance of Nationwide Permits, 72 Fed. Reg. at 11,193. A "Preliminary Jurisdictional Determination" is a "written indication[] that there may be waters of the United States on a parcel." 33 C.F.R. § 331.2. This Preliminary Jurisdictional Determination is not appealable, as opposed to an "Approved Jurisdictional Determination" which is appealable due to its final nature. Id. The Corps completed an in-office Preliminary Jurisdictional Determination estimating the total wetlands within the project area to be .9 acres on December 15, 2008. RA 3138; Doc. 91 at 36. The Corps updated the Preliminary

Jurisdictional Determination based on information submitted to the Corps by Drake after he requested an increase in project area, using the area and calculation provided by Drake. Doc. 91 at 37. Because there was no change between the Corps' initial Preliminary Jurisdictional Determination as to total wetland loss and the updated Preliminary Jurisdiction Determination, even though Drake requested that the two crossings be increased by 30 feet in length total beyond his initial estimation, Plaintiffs reason that the Corps erred in calculating the amount of wetlands within the project area, and mitigation was required. Doc. 90 at 33–34. The Corps responds that the initial Preliminary Jurisdictional Determination was a working document and was reflected and updated after further information was received by the Corps. Doc. 91 at 37. The Corps notes that this still is not a final determination as to total wetlands within the area, as only an Approved Jurisdictional Determination is final in nature and appealable, and Drake would have had to request one. Doc. 91 at 38; 33 C.F.R. § 331.2. Under the APA, this Court is unable to rule on agency actions that are not final in nature. 5 U.S.C. § 704; Franklin v. Massachusetts, 505 U.S. 788, 796–97 (1992).

Finally, similar to their arguments regarding the 2006 bridge exemption, Plaintiffs accuse the Corps of failing to take a hard look at Drake's project, which would have revealed a plan beyond the NWP 14 requirements, and its failure to do so was arbitrary and capricious. Doc. 90 at 34. Additional concerns were presented to the Corps prior to its determination that the 2009 gully crossings qualified under NWP, but these concerns did not relate to the placement of the 2009 gully crossing. See Doc. 90 at 34. The concerns identified by Plaintiffs fall within "claims that an agency has failed to take an action" and have already been deemed non-justiciable by this Court in this case. Sisseton-Wahpeton Oyate, 124 F. Supp. 3d at 963; see also Dubois v. Thomas, 820 F.2d 943, 950–51 (8th Cir. 1987). This Court thus finds that the Corps' decision

29

regarding the applicability of NWP 14 for Drake's 2009 gully crossings was supported by the record and was not arbitrary and capricious.

## V.     Conclusion

For the reasons explained above, the Court denies Plaintiffs' request for an injunction against the Corps, remands to the Corps for reconsideration whether the 2009 gully crossings were the type of undertaking that could affect historic properties under 36 C.F.R. § 800.3(a) and to complete the Section 106 process if so necessary, and denies all other requests for relief requested by Plaintiffs.  Judgement will enter accordingly.

DATED this   29ᵏ   day of September, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

30